# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 13 -763

SUNNI JENKINS

VERSUS

ALLEN LEBLANC, M.D.

**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 238,219
HONORABLE HARRY FRED RANDOW, DISTRICT JUDGE

**********

## JOHN E. CONERY
## JUDGE

**********

Court composed of Elizabeth A. Pickett, Billy Howard Ezell, and John E. Conery, Judges.

**AFFIRMED.**

**Victor Herbert Sooter**
**Sooter & Associates**
**A Limited Liability Company**
**Post Office Box 1671**
**Alexandria, Louisiana 71309**
**(318) 448-8301**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Allen LeBlanc, Jr., M.D.**

**Eugene A. Ledet, Jr.**
**Dalrymple & Ledet, LLC**
**1450 Dorchester Drive (71301)**
**Post Office Drawer 14440**
**Alexandria, Louisiana 71315**
**(318) 442-1818**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **Sunni Jenkins**

**CONERY, Judge.**

This is a medical malpractice claim filed by Sunni Jenkins ("Ms. Jenkins") against her former obstetrician-gynecologist ("OB-GYN"), Dr. Allen LeBlanc, Jr. ("Dr. LeBlanc"). Ms. Jenkins claims Dr. LeBlanc failed to inform her of the risks associated with the insertion and use of an intrauterine device, a Mirena™ IUD, a form of birth control. Ms. Jenkins claims that as a result of Dr. LeBlanc's failure to properly inform her of the risks of the use of the Mirena™ IUD, she suffered a perforated uterus, resulting in pelvic inflammatory disease ("PID"), that ultimately lead to her undergoing a total hysterectomy.

The trial court, after a two day bench trial and receipt of post-trial briefs from the parties, issued written reasons on March 18, 2013. In its written reasons, the trial court found Dr. LeBlanc had breached the standard of care in failing to inform Ms. Jenkins of the material risks of the use of an IUD, but the insertion of the IUD by Dr. LeBlanc was not casually related to Ms. Jenkins undergoing a total hysterectomy. The judgment dismissing Ms. Jenkins' claims was signed on April 2, 2013, from which she now appeals. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

Dr. LeBlanc was Ms. Jenkins' OB-GYN, and delivered two of her three children without complication. Ms. Jenkins was twenty-six years old at the time of her second delivery on November 19, 2006. She returned to see Dr. LeBlanc on December 8, 2006 with complaints of breast pain, for which he prescribed Clindamycin.

On December 27, 2006, Ms. Jenkins' next office visit, her examination was normal, and she requested some form of birth control. Ms. Jenkins claims that although various forms of birth control were discussed, both Dr. LeBlanc and his

nurse recommended a Mirena™ IUD. Ms. Jenkins claims that she was not given the Mirena™ IUD pamphlet outlining the risks of the IUD prior to its placement. Further, she testified that Dr. LeBlanc did not verbally advise her of the risk of perforation of the uterus, which could result in PID and thereby necessitate a total hysterectomy. Dr. LeBlanc, after giving Ms. Jenkins fifteen or twenty minutes to decide, performed the procedure and inserted the Mirena™ IUD. It is undisputed that Ms. Jenkins did not sign a consent form for the procedure. Thus, Ms. Jenkins claims that failure to give informed consent for the placement of the IUD violated the standard of care.

Dr. LeBlanc testified that Ms. Jenkins initially requested a hysterectomy, which surprised him, given her age of twenty-six. However, he recommended the Mirena™ IUD, as it is as effective as tubal ligation and lasts up to five years before removal is required. Also, the Mirena™ IUD has the lowest risk of adverse side effects of any means of birth control for lactating mothers. Additionally, the IUD is safe for both mother and child, and the risk of PID is only within the first twenty days following insertion. After the first twenty-day period, the risk of PID is the same for women without the Mirena™ IUD.

It is undisputed that Dr. LeBlanc inserted the Mirena™ IUD on December 27, 2006 and performed an ultrasound to confirm its proper placement. Ms. Jenkins returned on January 3, 2007 for her scheduled follow-up appointment. There was no evidence of any infection, and a second ultrasound was performed again confirming the proper placement of the IUD. Ms. Jenkins confirmed that she was able to palpate the strings attached to the IUD and once again voiced no complaints. The January 3, 2007 appointment was the last time Ms. Jenkins was seen as a patient by Dr. LeBlanc, as she did not return for her annual exam.

Approximately ten months later, on November 1, 2007, Ms. Jenkins, saw Dr. Amy Griffin ("Dr. Griffin") in order to establish a doctor-patient relationship with a family practitioner. Dr. Griffin's records reflect Ms. Jenkins complained of hot flashes, headaches and anxiety. Her physical examination revealed no abdominal or pelvic complaints of pain. Appropriate medication was prescribed and baseline laboratory work was ordered, the results of which showed a normal white blood count, and thus, no evidence of infection.

On December 11, 2007, Ms. Jenkins returned to Dr. Griffin, this time with complaints of dyspareunia (painful intercourse), and bladder incontinence. Dr. Griffin's exam revealed a retroverted uterus, non-tender, the IUD strings were in place, and there was no clinical evidence of PID.

Dr. Griffin referred Ms. Jenkins to Central Louisiana Imaging Center for a pelvic ultrasound on January 4, 2008, due to Ms. Jenkins complaints of pelvic pressure and stress incontinence. The results of the January 4, 2008, pelvic ultrasound revealed a retroverted uterus, the IUD within the endometrial canal, multiple bilateral ovarian cysts and complex fluid collection adjacent to the right ovary, containing a large septation. An ovarian cyst with septation is made up of both solid and liquid matter, and may become malignant. The January 4, 2008, pelvic ultrasound did not show that the IUD had perforated Ms. Jenkins' uterus.

On January 8, 2008, a follow-up CT scan of Ms. Jenkins's abdomen was conducted in order to further address the fluid collection in the right ovary, previously discovered in the January 4, 2008 ultrasound. This CT scan revealed for the first time the IUD perforation at the top of her uterus. Based on the findings in the ultrasound and CT scan, Dr. Griffin referred Ms. Jenkins to Dr. Amy Babin ("Dr. Babin"), an OB-GYN, for a work-up.

3

On January 9, 2008, Ms. Jenkins saw Dr. Babin and reported having pelvic pain for the last three months, a complaint not reflected in Dr. Griffin's notes. Dr. Babin reviewed the January 4, 2008 ultrasound and the January 8, 2008 CT scan and determined the best course of action was to remove the IUD under laparoscopic observation. Dr. Babin, however, did not see the need for the immediate removal of the IUD and left on vacation.

On January 13, 2008, Ms. Jenkins went to the emergency room of the Christus St. Francis Cabrini Hospital ("Cabrini") where Dr. James Gates ("Dr. Gates"), Dr. Babin's partner, was the attending OB-GYN physician on call. Ms. Jenkins complained of worsening abdominal pain, dysuria (painful urination), and constipation with mild nausea, but had no fever. After a pelvic examination, Dr. Gates diagnosed Ms. Jenkins with probable endometritis from a perforated IUD. He admitted her to the hospital, administrated IV antibiotics and on January 14, 2008, performed a diagnostic laparoscopy removing the IUD. Ms. Jenkins was discharged the same day with pain medication and instructions to forego heavy lifting for one week and to follow-up with Dr. Babin in two weeks.

Dr. Gates' operative notes reflect a normal procedure, with no evidence of any PID. The perforation in the anterior uterine wall did not bleed and required no sutures or cauterization. Intra-operative photographs of the procedure did not reveal any evidence of PID, and Dr. Gates described the photographs as depicting a "stone cold normal pelvis."

On January 20, 2008, Ms. Jenkins once again went to the Cabrini emergency room complaining of fever and nausea. She was diagnosed with possible endometriosis and admitted for antibiotic treatment by Dr. Babin. Dr. Babin later noted a diagnosis of PID. Ms. Jenkins was discharged from the

4

hospital on January 24, 2008, and ordered to continue Augmentin for ten days, return to see Dr. Babin in seven to ten days, and to call with any acute changes.

On February 1, 2008, Ms. Jenkins returned to see Dr. Babin. Ms. Jenkins asked Dr. Babin to perform a vaginal hysterectomy. Dr. Jenkins determined that the hysterectomy was the only course of action due to Ms. Jenkins' "unrelenting pain," two weeks after the removal of the IUD. Although Dr. Babin listed a diagnosis of PID for Ms. Jenkins, she acknowledged at trial that there were no clinical signs to support the diagnosis. The pre-surgical laboratory results did not show an elevated white blood count, which would be indicative of an infection, and the operative report subsequent to Ms. Jenkins' hysterectomy revealed no evidence of PID, as both her tubes and ovaries were noted to be normal.

After the hysterectomy procedure, Ms. Jenkins' uterus, cervix, bilateral tubes, and ovaries were sent to Dr. Irene Manlapaz, a pathologist for examination. Her pathology report determined that Ms. Jenkins was suffering from adenomyosis, which occurs when the endometrial tissue which lines the uterus moves to the outer walls of the uterus. Dr. Manlapaz testified that the adenomyosis was the cause of her abdominal pain, and her condition was not caused or related to the perforation of the uterus by the IUD.

Dr. Joel Hall, a member of the medical review panel, noted adenomyosis can only be "suspected" as a cause of abdominal pain and only confirmed by pathological examination after the hysterectomy is performed. There was no evidence of PID in Dr. Manlapaz's pathology report on Ms. Jenkins. Ms. Jenkins did not call an expert pathologist in an effort to refute the findings of Dr. Manlapaz. Only her treating physicians were called to testify as experts at trial.

Ms. Jenkins filed a timely complaint against Dr. LeBlanc and requested the matter be properly submitted to a medical review panel. The panel found that Dr. LeBlanc's actions in recommending and inserting the Mirena™ IUD were appropriate and that in this respect, he did not breach the standard of care. The panel, however, found a material issue of fact remained concerning whether or not Ms. Jenkins was informed of the potential risks of the use of an IUD.

After the medical review panel decision was rendered, Ms. Jenkins timely filed suit alleging Dr. LeBlanc breached the standard of care by failing to inform her of the risks associated with the Mirena™ IUD, which she claimed caused her to develop PID and resulted in her undergoing a total hysterectomy. Ms. Jenkins reduced her claim for damages to less than $50,000, which resulted in her case being heard by the trial court and not a jury.

The trial court, after a two day bench trial and receipt of post-trial briefs from the parties, issued written reasons on March 18, 2013. In its written reasons the trial court found Dr. LeBlanc had breached the standard of care in failing to inform Ms. Jenkins of the material risks of the use of an IUD, but the insertion of the IUD by Dr. LeBlanc was not casually related to Ms. Jenkins undergoing a total hysterectomy. A judgment dismissing Ms. Jenkins' claims was signed on April 2, 2013, from which she now appeals.[1]

## ASSIGNMENTS OF ERROR

1.  The trial court's determination that Ms. Jenkins failed to show a causal connection between Dr. LeBlanc's failure to inform the patient of the material risks associated with an intrauterine device (IUD) and the resulting damages was manifestly erroneous and clearly wrong.

---

[1] The brief of Appellee, Dr. LeBlanc argues that the trial court erred in finding that Dr. LeBlanc breached the standard of care in failing to discuss the risks of the use of an IUD with Mrs. Jenkins. However, there was no separate appeal of this issue, and therefore, it is not before this Court on appeal.

2. The trial court was manifestly erroneous and clearly wrong in weighing the evidence which overwhelmingly supported Ms. Jenkins' pain and gynecological problems were associated with the perforated uterus, not adenomyosis.

3. The trial court abused its much discretion in affording significant weight to the testimony of James Gates M.D. considering his blatant attempt at favoritism and advocacy, as well as targeted change in testimony.

## LAW AND DISCUSSION

### *Standard of Review*

The appellate court must determine whether the trial court committed an error of law or made a factual finding that was manifestly erroneous or clearly wrong. *Gibson v. State,* 99-1730 (La. 4/11/00), 758 So.2d 782, *cert. denied,* 531 U.S. 1052, 121 S.Ct. 656 (2000). The reviewing court must review the record in its entirety to make this determination. *Stobart v. State, Dep't of Transp. and Dev.,* 617 So.2d 880 (La.1993). "Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony." *Id.* at 882. "[W]here two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." *Id.* at 883.

### *Louisiana Revised Statutes 9:2794*

Louisiana Revised Statutes 9:2794 is the applicable law governing a claim against a physician for medical malpractice and provides the necessary elements that a plaintiff must meet in order to prevail on a claim of negligence against a physician. La.R.S. 9:2794(A) provides in pertinent part:

(1) The degree of knowledge or skill possessed or the degree of care

7

ordinarily exercised by physicians . . . licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians . . . within the involved medical specialty.

(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.

(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

### *Assignment of Errors One and Two*

The trial judge in this case thoroughly considered all the evidence and comprehensively reviewed all the legal issues presented. The trial court did find that Dr. LeBlanc breached the standard of care by failing to provide sufficient informed consent. The trial court then went on to find no causal connection between the lack of informed consent and plaintiff's complaints. We quote from and adopt its findings and well-written reasons for judgment in pertinent part:

> However, under both La. R.S. 9:2794 and La. R.S. 40:1299.40, the plaintiff must prove, in order to receive an award of damages, that there is a causal relationship between the doctor's failure to inform and the damages claimed by the plaintiff. In the present case, the Court finds that there exists no causal relationship between Dr. LeBlanc's failures to inform Ms. Jenkins of the material risks of use of the IUD with the damages she claims.
>
> At trial it was shown that Dr. Babin was the one who diagnosed Ms. Jenkins with PID. When Ms. Jenkins again presented to the emergency room on January 14, Dr. Babin diagnosed her as suffering from PID. Dr. Babin prescribed antibiotics and discharged her four days later. Plaintiff returned to Dr. Babin, where it was discussed and decided that plaintiff would undergo a total hysterectomy as a definitive surgical treatment for her pain. The hysterectomy was

performed on February 5, 2008, where again, Dr. Babin noted that Ms. Jenkins was suffering from PID, attributing PID to the perforated uterus.

While there is an increased risk of perforation of the uterus and an increased risk of contracting PID as a result of using an IUD; the use of the Mirena IUD by plaintiff was not the cause of her needing a hysterectomy. Ms. Jenkins suffered from what has now been diagnosed as adenomyosis, a uterine disease that occurs when endometrial tissue, which normally lines the uterus, exists within and grows into the muscular wall of the uterus. Dr. Paul Crawford, who served on the Medical Review Panel in plaintiff s case, testified in his deposition that a woman who has adenomyosis can experience severe abdominal pain, which such symptoms can overlap those symptoms that women who contract PID suffer as well. Further, Dr. Crawford stated that the diagnosis of adenomyosis is not a pre-operative diagnosis; but rather a pathological diagnosis, meaning that adenomyosis is generally only discovered upon a review of the uterus post-hysterectomy.

All doctors who testified at trial indicated that plaintiff did not suffer from PID. Dr. Babin testified that; after reviewing her notes and the pathology report, there was no indication of any infection--and that the adenomyosis finding explained plaintiff's perforation and symptoms. She further stated that it was likely that had plaintiff not suffered from adenomyosis, she would not be in court today. Dr. Gates testified that it was his opinion that the IUD did not cause Ms. Jenkins to undergo a hysterectomy. Further, Dr. Christopher Hall, who served on the medical review panel, testified that upon review of Dr. Babin's notes and the pathology report, he did not believe that Ms. Jenkins suffered from PID, and that it was his opinion she was misdiagnosed with PID.

At trial, the Court was made aware that Dr. Babin's opinion had changed and likely had changed due to conversations with Dr. Gates. Dr. Gates is the senior physician in the clinic where Dr. Babin practices. In both her deposition and trial testimony, Dr. Babin admitted that she discussed the case with Dr. Gates on multiple occasions. She further admitted in her deposition that she "agreed with him" as to Dr. Gates' opinion that she had misdiagnosed plaintiff with PID.

The court has struggled with its determination of how much credibility to place on Dr. Babin's opinions and testimony. While it is concerned as to how and why Dr. Babin changed her opinion as to the initial diagnosis of the PID, this Court ultimately accepts Dr. Babin's testimony. The court is of the opinion that Dr. Gates has influenced Dr. Babin's change, but that this change of opinion was further advanced by Dr. Babin's own review of her notes and reports. She indicated to

the court that upon further review of her notes and pathology report, she came to the conclusion as well that there was no indication of infection, which would be indicative of PID. While Dr. Babin's opinion may have been influenced, the court ultimately accepts Dr. Babin's trial testimony, as her change of opinion was further substantiated by the testimony and opinions of Dr. Gates and Dr. Crawford.

The Court is of the opinion that the adenomyosis was the cause of Ms. Jenkins undergoing a total hysterectomy-not the use of the Minera IUD. As such, while, Dr. LeBlanc may not have discussed all the material risks associated with using an IUD, this conduct, however "wrongful" does not dispute the fact that use of the 1UD was not the cause of Ms. Jenkins undergoing a total hysterectomy. The Court is of the opinion that Ms. Jenkins has failed to show a causal connection between Dr. LeBlanc's failure to inform the patient of the material risks and the plaintiff s damages.

The trial court thoughtfully considered all of the plaintiff's claims and arguments, evaluated the credibility of the witnesses, and the sufficiency of the evidence. We cannot say that the trial court's findings were manifestly erroneous. Thus, Ms. Jenkins assignments of error numbered one and two are without merit.

*Assignment of Error Three*

Ms. Jenkins argues that the trial court abused its "discretion in affording significant weight to the testimony of James Gates M.D. considering his blatant attempt at favoritism and advocacy, as well as targeted change in testimony." In this assignment of error, Ms. Jenkins argues that the trial court failed to take into account the influence that Dr. Gates may have exerted on his partner Dr. Babin. Dr. Babin was the only physician to diagnose Ms. Jenkins with PID prior to the hysterectomy. However, once the pathology report of Dr. Manlapaz confirmed adenomyosis and found no evidence of PID, Dr. Babin reviewed her notes and changed her diagnosis. As previously stated, Ms. Jenkins did not call an expert pathologist to refute the pathology report.

10

In addition, when Ms. Jenkins came to the Cabrini Emergency Room on January 13, 2008, her white blood cell count was normal, belying the presence of an infection, and when the IUD was removed by Dr. Gates on January 14, 2008, there was no evidence of PID per the intra-operative photographs.

Once again, the records of pre-surgical laboratory blood work, conducted prior to the hysterectomy done by Dr. Babin on February 5, 2008, did not reflect an elevated white blood count which would have indicated the presence of an infection.

These findings and the undisputed pathology report of Dr. Manlapaz, coupled with the testimony of Dr. Hall that adenomyosis can only be "suspected" as a cause of abdominal pain and only confirmed by pathological examination after the hysterectomy is performed, fully supports the trial court's findings and his determination of the credibility of Dr. Babin's testimony. Thus, we find that this assignment of error is also without merit.

## CONCLUSION

For the forgoing reasons, we affirm, in its entirety, the trial court's Judgment in favor of Dr. Allen LeBlanc, Jr., dismissing Sunni Jenkins' claim against Dr. Allen LeBlanc, Jr. with prejudice. Costs of this appeal are assessed to Sunni Jenkins.

**AFFIRMED.**